UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA
FOURTH DIVISION
_____

| | |
|---|---|
| Bobbie C. Allen,<br>on behalf of himself and others<br>similarly situated,<br>      Plaintiff<br>vs.<br><br>Mall of America, an assumed name,<br>MOAC Mall Holdings LLC, a Delaware<br>corporation; and its security officers<br>Chelsey Christensen and<br>Ashley Foster,<br>      Defendants. | Civil File: 09 cv 1046 (JRT/SRN)<br><br><br><br>**AMENDED COMPLAINT**<br><br><br>Jury Trial Demand |

   This *Amended* Complaint is filed in order to name the correct legal entity, MOAC Mall Holdings LLC, for defendant Mall of America, an assumed name. This is a civil rights action in which the Plaintiff, Bobbie C. Allen, seeks declaratory relief and damages from Defendants above-named for the violation of his civil rights and other damages suffered as a result of the unlawful actions described below.

**<u>Jurisdiction and Venue</u>**

   1.  This is an action under Title II of the Civil Rights Act of 1964, as amended, (42 U.S.C §2000a, et. seq.) ("Title II"); 42 U.S.C. §1981; 42 U.S.C. §1983; and the Minnesota Human Rights Act (Minn. Stat. 363A, et. seq.)("MHRA"). Jurisdiction of this court rests on 28 U.S.C. §1343(3) and (4); 28 U.S.C. §1331. Supplemental jurisdiction of Plaintiff's MHRA claims and tort claims are brought pursuant to 28 U.S.C. §1367. The

practices alleged to be unlawful have been committed within the jurisdiction of the United States District Court for the District of Minnesota.

2. To the extent required by law, charges of discrimination were filed with the Minnesota Department of Human Rights ("MDHR"). Following investigation, the MDHR determined that there was probable cause to believe that Mr. Allen was the subject of illegal discrimination based on his race. Mr. Allen gave timely and proper notice to the MDHR, the State authority, of intent to bring this lawsuit. All conditions precedent to the filing of this lawsuit have been properly met.

### Parties

3. Plaintiff Bobbie C. Allen, an African-American male, is a citizen of the United States and a resident of Minnesota, who was age 42 at the time relevant to facts in this Complaint. The police incident report which identifies Mr. Allen as "Black With Hispanic" is not correct.

4. Defendant Mall of America (hereinafter "MOA"), located in Bloomington, Minnesota, is a place of exhibition and entertainment, and a place of public accommodation pursuant to Title II of the Civil Rights Act and the MHRA. The MOA provides security services on its premises, in conjunction with the City of Bloomington police force, and may be considered acting jointly with the police for purposes of Section 1981 and Section 1983.

4a. Mall of America is an assumed name, with its legal entity registered with the Minnesota Secretary of State as MOAC Mall Holdings LLC, a Delaware corporation,

with registered agent in Minneapolis, Minnesota. Defendants Mall of America and MOAC Mall Holdings LLC are jointly referenced hereinafter as "MOA."

5.  Defendant Chelsey Christensen (hereinafter "Officer Christensen") was, at all times relevant to this Complaint, an officer with MOA's security force, assigned to patrol the MOA.

6.  Defendant Ashley Foster (hereinafter "Officer Foster") was, at all times relevant to this Complaint, an officer with MOA's security force, assigned to patrol the MOA and to supervise Officer Christensen.

## Facts

7.  On June 25, 2007, Mr. Allen went to the MOA to have lunch with a friend. Upon arriving, he learned that his friend, a white female who worked at the Debs store, had to work longer than expected.

8.  While waiting for his friend, Mr. Allen used an ATM machine at MOA, bought a café mocha at a MOA coffee shop, and then sat down on one of the benches in the public area of the MOA, outside of the store where his friend was working. While waiting, Mr. Allen drank his coffee and wrote in his journal.

9.  Not long after he began his wait, Mr. Allen was approached by Officer Christensen, who showed her security badge and began asking him personal questions. Christensen noted in her incident report that she told Mr. Allen that he was "randomly selected" for a survey; but this was not true since she had been watching him for about 15 minutes and she had specifically selected him as a "suspicious person."

10. As Officer Christensen watched Mr. Allen, sitting on the bench in the middle of the MOA waiting for his friend, she identified the following behaviors as suspicious: talking to a female, writing in a notebook, looking around at people, and looking at his watch.

11. According to the MOA and the officers, the job of the security force is to make the mall a safe place and they are to "intervene" to prevent "dangerous or illegal" conduct. Officer Christensen is a member of the MOA's Risk Assessment and Mitigation unit (RAM).

12. According to information from the MOA, the RAM unit "specializes in behavior profiling." Officers in the unit are trained to look for bad "intent" on the part of MOA guests. As part of the standard procedure, the RAM unit prepares reports and field notes on the "suspicious" persons whom they question.

13. The RAM unit works jointly with the City of Bloomington police force with regard to actions taken, or not taken, against persons identified by MOA security as "suspicious." The Bloomington police department maintains a substation at the MOA. When the MOA security officer determines the need for police involvement for a "suspicious" person, they put out a dispatch and the Bloomington police officer(s) respond and act based upon the information provided by MOA security.

14. In order to protect the security of the MOA, Officer Christensen's incident report states that she asked Mr. Allen the following questions:

* do you have a few minutes to spare?
* what is your name?
* what his friend's name was?

* where he likes to shop?
* where he likes to eat when he visits the mall?
* what coffee do you like best?

15. Mr. Allen was startled and offended by being approached and asked intrusive questions for private information. Nevertheless, Mr. Allen cooperated in answering. In her incident report, Christensen admitted that Mr. Allen gave the following answers:   * he had time to spare, "I'm waiting for a friend in Debs"

* his name was "Bobbie"
* "I was just at Caribou"
* "I like to write"
* "I think the last time I was here I had Chinese food"
* "the cherry mocha lattes"

16. Mr. Allen objected when asked to give private information about his friend. After several more questions, he told Officer Christensen that he was uncomfortable with her intrusive questions into private matters and that he believed her choosing him for questioning was racially based.

17. Mr. Allen told Officer Christensen that he had nothing else to say. He confirmed that he had done nothing wrong and that she should go ask someone else questions. At no time did Mr. Allen even raise his voice. At no time was Mr. Allen advised that he was free to simply leave or to refuse to answer questions.

18. There were several other MOA guests around at the time of this questioning, including a white male – also sitting, waiting and looking around – who sat on the bench over from where Mr. Allen sat. These persons were not subjected to the allegedly random "survey."

5

19.     While the interrogation by Officer Christensen was in progress, Mr. Allen's friend (from Deb's) came out of the store and joined them.  She verified that Mr. Allen was meeting her for lunch, that he had to wait a little longer, and that he was her friend.  The friend then returned to the store.

20.     Despite Mr. Allen's cooperation and the friend's verification, Officer Christensen continued to question him.  In her incident report, Christensen admits that she asked Mr. Allen "where he was planning on going to lunch" and that he again cooperated by answering "it was his friends decision."

21.     Despite Mr. Allen's repeated cooperation in answering these questions, Officer Christensen called her supervisor, Officer Foster, for back-up.  When Officer Foster arrived, both officers stood over Mr. Allen asking questions.  By now, Mr. Allen was becoming concerned and was afraid to leave the bench with the officers around him.

22.     At the same time, Officer Christensen had MOA dispatch call in the Bloomington police department for what she reported as a "very uncooperative" male.  According to the MOA, Officer Christensen acted in accordance with the MOA procedures in bringing in the Bloomington Police Department.

23.     Within minutes, two Bloomington police officers arrived and joined the security officers around Mr. Allen, who remained seated on the bench.  Per standard policy, procedure and training the security officers then briefed the police officers as to why Mr. Allen was "suspicious."

6

24. Relying upon the MOA security officers' version of the facts, the Bloomington police asked Mr. Allen to produce his identification, which he did. Mr. Allen did not believe he was free to leave without responding to the police demands.

25. Mr. Allen was afraid for his own safety because he was now surrounded by four officers, two of whom were armed police, and he felt helpless. He tried to explain that he had done nothing wrong, that he was simply meeting a friend for lunch, and that the MOA security officers were harassing him.

26. The police officers took no information from Mr. Allen or his friend. The only investigation was that which was supplied by the MOA security officers to the police. Before leaving the area, the Bloomington police instructed Mr. Allen to let the MOA security do its job. The two police officers then left Mr. Allen in the hands of the two MOA security officers.

27. Even after the Bloomington police officers left the area, MOA Officers Foster and Christensen, did not stop questioning Mr. Allen. They later reported that the reason they did not stop, even after the police had apparently cleared him, was because Mr. Allen had earlier raised objections to being racially profiled.

28. When Mr. Allen's friend joined him again, they were asked additional questions about their relationship and lunch plans, and then were permitted to leave and go to lunch.

29. The interrogation of Mr. Allen lasted more than thirty minutes, in a public area, with many MOA visitors and employees watching as he was questioned, as more

security arrived, and as the police arrived. At all times, Mr. Allen attempted to avoid confrontation and further humiliation and harassment.

30. Mr. Allen's friend, and others in her workplace, watched out the storefront as Mr. Allen being surrounded and questioned in this public setting. After the police had arrived, Mr. Allen's friend was questioned by one of her managers about her relationship with the man being who was surrounded by officers.

31. The MOA's security force, in concert with the Bloomington police department, secure the MOA by determining hostile "intent" by observing and interviewing guests at the MOA, who they selectively target to stop and interrogate.

32. Defendants' actions against Mr. Allen, by directing, authorizing and conducting the stopping, questioning, surrounding and demand for identification or other information by the police, despite the absence of reasonable suspicion of any wrongdoing, effectively condones, encourages and relies upon unlawful racial profiling.

33. From the time that he was stopped until the interrogation ended, Mr. Allen was in a public area of the MOA. Defendants has no reasonable basis for stopping Mr. Allen, for surrounding him, for questioning him, for calling in police, or for requiring him to produce identification. In fact, within five minutes of questioning Mr. Allen, Defendants were aware of who he was, who his friend was, why he was at the MOA, that he was a writer, and what kind of coffee he liked.

34. The actions of Defendants Christenson and Foster were taken pursuant to the directions, training and standard policy and procedure of the MOA security department. The MOA, working jointly with the Bloomington police department,

authorizes officers to stop and question guests with little justification, to use race and ethnicity as a factor in identifying "suspicious" persons, and to use a person's assertion of his constitutionally guaranteed civil rights as a basis for further detention, interrogation, and demand for identification.

35. The actions of Defendants, as describe above were willful and intentional, and as a proximate result of their actions the Plaintiff has suffered public humiliation, embarrassment, confinement, and ongoing physical and mental distress.

## Count I
## Title II – The Civil Rights Act – Public Accommodation

36. The allegation in paragraphs above are realleged and incorporated by reference as if fully set forth herein.

37. The actions of Defendants, as described herein, deprived Plaintiff of the full and equal enjoyment of the goods, services, facilities, privileges, advantages, and accommodations of the MOA, a place of public accommodation, without discrimination on the basis of race, in violation of Title II, Civil Rights Act, 42 U.S.C. §2000a et.seq.

## Count II
## 42 U.S.C. §1981

38. The allegation in paragraphs above are realleged and incorporated by reference as if fully set forth herein.

39. The actions of Defendants while willfully participating in joint activity with the Bloomington police department, as described herein, unlawfully denied Plaintiff the full and equal benefit of all laws and proceedings for the security of persons and property,

in violation of 42 U.S.C. §1981, which prohibits discrimination on the basis of race and ethnicity.

## Count III
## 42 U.S.C. §1983

40. The allegation in paragraphs above are realleged and incorporated by reference as if fully set forth herein.

41. The actions of Defendants while willfully participating in joint activity with the Bloomington police department, as described herein, unlawfully deprived Plaintiff of the equal protection of the laws by subjecting him to racial profiling and discriminatory treatment, in violation of 42 U.S.C. §1983.

## Count IV
## Minnesota Human Rights Act – Public Accommodation Discrimination

42. The allegation in paragraphs above are realleged and incorporated by reference as if fully set forth herein.

43. The actions of Defendants, as described herein, denied Plaintiff the full and equal enjoyment of the goods, services, facilities, privileges, advantages, and accommodations of the MOA, a place of public accommodation, without discrimination on the basis of race, in violation of The Minnesota Human Rights Act, Minn. Stat. §363A.11, Subd.1(a)(1).

## Count V
## Invasion of Privacy – Intrusion Upon Seclusion

44. The allegation in paragraphs above are realleged and incorporated by reference as if fully set forth herein.

45. The actions of Defendants, as described above, included ongoing intrusive questioning about private matters. These actions constitute intentional intrusion which was high offensive to Plaintiff into matters in which he had a legitimate expectation of privacy.

## Count VI
## False Imprisonment

46. The allegation in paragraphs above are realleged and incorporated by reference as if fully set forth herein.

47. The actions of Defendants, as described above, included intentionally detaining Plaintiff without reasonable suspicion of wrongdoing and without his consent, for more than thirty minutes. Plaintiff was afraid to try to leave, while he was being surrounded by officers and interrogated on a bench. These actions constitute false imprisonment.

## County VII
## Defamation by Action

48. The allegation in paragraphs above are realleged and incorporated by reference as if fully set forth herein.

49. The actions of Defendants, as described above, included detaining Plaintiff on the bench in a public area, for a long time, while questioning him and surrounding him with officers. These actions continued without justification for an unreasonable amount of time and conveyed false and negative statements about Plaintiff to the numerous third parties who were present in the public area. Defendants' actions constitute defamation.

**Damages and Remedial Action**

50.     The allegations in paragraphs above are realleged and incorporated by reference as if fully set forth herein.

51.     As a direct and proximate result of Defendants' actions, Plaintiff has sustained severe embarrassment, humiliation, mental and physical distress all to his damage in an amount in excess of One Hundred Thousand Dollars, exact amount to be fully determined at trial.

**WHEREFORE, plaintiff respectfully the following relief:**

a.      That the practices of the Defendants complained of be adjudged, decreed, and declared to be in violation of the rights secured to the plaintiff pursuant to Title II of the Civil Rights Act, 42 U.S.C. §1981, 42 U.S.C. §1983, and the Minnesota Human Rights Act.

b.      That the Defendants be enjoined from their policies and practice of racial profiling and discriminatory stops and interrogations based on race and/or ethnicity.

c.      That Defendants be ordered to adopt and carry out security policies and practices in accord and conformity with the requirements of Federal and State law and which eradicate the effects of their past and present unlawful discriminatory practices.

d.      That Defendants, each and all of them, make whole the Plaintiff through restitution in the form of compensatory damages and punitive damages, as allowed by statutory and tort claims, in amounts to be determined at trial.

e.      That the Court award to Plaintiff reasonable attorneys fees and the costs of this action, together with pre-and post-judgment interest.

  f. That the Court grant Plaintiff such other and further relief as it may deem just and proper.

  g. That the Court retain jurisdiction until such time as the Court is satisfied that the Defendants have remedied the practices complained of herein and are determined to be in full compliance with the law.

**JURY DEMAND:** Plaintiff requests trial by jury on all questions of fact.

          **Dorene R. Sarnoski Law Office**

Dated: May 27, 2009      /s/  Dorene R. Sarnoski
             Dorene R. Sarnoski (#212933)
             Attorney for Plaintiff
             402 Union Plaza
             333 Washington Avenue N.
             Minneapolis, MN  55401
             (612) 359-0050